**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **CHRISTOPHER C. DECAMP** | : | |
| | : | |
| Plaintiff, | : | |
| | : | **JURY TRIAL DEMANDED** |
| | : | |
| v. | : | |
| | : | |
| | : | |
| **DISNEY STREAMING TECHNOLOGY** | : | |
| **LLC** | : | |
| | : | |
| Defendant. | : | **MARCH 26, 2026** |

**COMPLAINT**

1. The Plaintiff, Christopher C. DeCamp ("Plaintiff" or "Mr. DeCamp"), is a natural person and resident of Cancún, Quintana Roo, Mexico.

2. The Defendant, Disney Streaming Technology LLC ("Defendant" or "Disney"), is a limited liability company that conducts substantial business within the State of Connecticut, having a principal place of business located at 935 Middle St, Bristol, Connecticut 06010, where Plaintiff was employed.

3. Defendant employs more than twenty (20) employees.

**JURISDICTION AND VENUE**

4. This action arises under the Americans with Disabilities Act ("ADA") as amended by the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), 42 U.S.C. § 12101 et seq.; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq.; and Connecticut General Statutes.

5. The jurisdiction of this court is founded upon 28 U.S.C. § 1331 (federal question) and the provisions of 28 U.S.C. § 1343.

1

6. Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391(b) in that the claims arose in this district and Plaintiff resides in this district.

7. Supplemental jurisdiction over Plaintiff's supplemental state law claims is invoked pursuant to 28 U.S.C. § 1367 as the claims arise out of the same transaction and occurrences as Plaintiff's federal claims.

8. Costs, expert witness fees, and attorney's fees are sought pursuant to 42 U.S.C. § 1988.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9. Plaintiff filed a timely charge of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") and timely brings this action.

## STATEMENT OF FACTS

10. Mr. DeCamp is 65-years-old (D/O/B 8/19/1960).

11. Mr. DeCamp is a disabled individual who has been diagnosed with slight-to-moderate hearing loss in his ears due to his age and the type of television broadcasting work that he has done that exposed him to listening to loud noises, music, etc.

12. Mr. DeCamp also suffers from a condition referred to as Eustachian Tube Dysfunction, where his Eustachian Tube does not equalize the air pressure in his ears properly, which periodically causes his ears to feel plugged up or blocked. This also causes him not to always hear properly or causes him to occasionally to have people repeat themselves when talking to him. He also has to turn the volume up louder than normal when monitoring a particular program or event.

13. Mr. DeCamp's medication conditions are currently being treated by his doctor.

    A. **Mr. DeCamp's employment history at Disney.**

2

14. On May 12, 2021, Mr. DeCamp received an employment offer from Disney for the position of Transmission Specialist II within the Transmission Operations team, reporting to Vincent Thibeau ("Mr. Thibeau"), V.P. of ESPN Transmission, commencing on June 21, 2021.

15. Mr. DeCamp would be paid an hourly rate of $38.4615, less applicable taxes, withholdings and deductions, which annualized to $80,000.00, payable weekly.

16. Mr. DeCamp relocated from Castaic, California to Bristol, Connecticut for this position.

17. On June 21, 2021, Mr. DeCamp began his employment for Disney.

18. On October 15, 2021, Mr. DeCamp received an Individualized Performance Summary wherein he was described as "an enthusiastic employee who has been very engaged in his training."

19. He was also described as "making steady progress in streaming and is now spending more time in the IRM role digging deeper into the many nuances of our workflow." The performance summary noted that Mr. DeCamp "will start this next performance year with Mike Gugliotti ("Mr. Gugliotti") as his new manager."

20. On January 28, 2022, Mr. DeCamp received an email from Mr. Gugliotti stating Mr. DeCamp had previously participated in a Streaming evaluation with Steve Braley ("Mr. Braley") on January 21, 2022. Based on Mr. Baley's feedback, Mr. DeCamp successfully demonstrated that he understands the Streaming workflow. Mr. DeCamp also consistently correctly answered several questions and "what-if scenarios" asked of him. Overall, Mr. DeCamp demonstrated a good understanding of the role.

3

21. However, Mr. DeCamp, through no fault of his own, had not been afforded an opportunity to demonstrate that he can apply what he knows and keep up when the pace picks up in Streaming. Mr. Gugliotti noted this was "not a performance issue, just not the best circumstances for an accurate assessment of [Mr. DeCamp's] skillset and ability."

22. Mr. DeCamp was scheduled for a second evaluation with Sean Sorensen ("Mr. Sorensen"), Senior Transmission Specialist, on February 6, 2022. The second evaluation would have Mr. DeCamp working the E+ Streaming role (Streaming-1) alone, with Mr. Sorenson in Streaming-2 as an observer. This would give Mr. DeCamp the opportunity to complete his evaluation by demonstrating that he has developed enough of an ability in the Streaming role to enable him to support that role unassisted.

23. On February 22, 2022, Mr. DeCamp sent an email to Mr. Thibeau and Mr. Gugliotti expressing concern over his future IRM Training. He was under the impression that Mr. Gugliotti would do his best to provide Mr. DeCamp with the best support person available as often as practical to help guide him forward in his IRM Training, and answer as many questions/concerns that he may have about the IRM Training process. This would help Mr. DeCamp move forward toward the common goal of having him evaluated and cleared in that IRM role by mid-April.

24. On March 22, 2022, a 1:1 meeting was held between Mr. DeCamp and Mr. Gugliotti where it was agreed that Mr. DeCamp's current IRM Training was going well. Mr. DeCamp experienced several productive training sessions with Colby Kelly ("Mr. Kelly") and his training session with Mr. Sorensen that past week was very useful. Mr.

DeCamp stated he informed Mr. Gugliotti that when he was placed in the IRM position last Sunday, and with the support of other Senior Transmission Operators such as Mr. Kelly, Timothy LeBlanc, Mr. Sorensen and Andrew Pometti, he got through the day successfully.

25. Mr. DeCamp and Mr. Gugliotti both agreed that if Mr. DeCamp stays on this course of continued, consistent IRM Training at least a couple of days a week with this caliber of Senior Transmission Operation's Team, that Mr. DeCamp should be able to successfully complete the IRM Training goals. They both agreed that as Mr. DeCamp continues to make progress training in IRM, they will both decide on a future date when it should be expected that Mr. DeCamp should be evaluated and cleared in the IRM position.

26. On August 17, 2022, Mr. Sorensen sent an IRM Evaluation of Mr. DeCamp to Mr. Gugliotti stating he was "definitely improving," "getting better with routine operation of IRM," and "he is starting to lock down a lot of the background theory needed to help troubleshoot and build more proficiently."

27. The evaluation noted that Mr. DeCamp had "never been shown how to do ASI transmits" and "he hadn't been shown manual RF routing via the router." The recommendation for Mr. DeCamp moving forward was "time in the chair with a trainer acting as a safety net and quizzing him here and there" and "some more spot training with [ASI] transmits and manual tuning."

28. Mr. DeCamp's 2022 End of Year evaluation, after completing his first year as a Transmission Specialist II, stated he achieved many of the goals as outlined under

5

Training & Development for 2022. He was cleared in the role of Streaming Operator and was given a positive evaluation in the IRM role as provided by Mr. Sorensen.

29. Mr. DeCamp also continued the training process in the various transmission support roles, including engaging various Senior Transmission Operators in the navigation of IRM, building out and troubleshooting transmission feeds, and reviewing SOP's and other Confluence Informational Guides to help resolve any technical issues encountered in the Streaming and IRM roles.

30. Mr. DeCamp believed that he could realistically be cleared in the IRM role by the end of 2022. He felt his role as a Transmission Specialist II has been enhanced by his completion of his commitments and goals, his eagerness to learn new skills, his steadfast dedication to making personal improvements, and by successfully meeting the daily challenges and requirements of the job.

**B. Mr. DeCamp is subjected to a hostile work environment and bullying.**

31. On or about August 7, 2023, Mr. DeCamp met with Steve Simeonidis ("Mr. Simeonidis") and Joe McCormick (Mr. McCormick") to discuss a complaint he had against Rick Bartholomew ("Mr. Bartholomew") regarding a hostile work environment and aggressive/bullying behavior. Mr. DeCamp provided a timeline of the bullying and mocking of his hearing impairment that he endured from Mr. Bartholomew over a 5 to 6-week period.

32. The hostile behavior Mr. DeCamp endured from Mr. Bartholomew included an incident on June 29, 2023, when Mr. DeCamp had been scheduled to work in the Streaming 1 position alongside with Mr. Bartholomew from 4:00 – 8:00 p.m. Mr.

DeCamp was thereafter to transition to a Live Training Session with Chris Albini ("Mr. Albini") for the remainder of his shift from 8:00 p.m. – 2:30 a.m.

33. The process of Mr. DeCamp checking the upcoming feeds required him to "lock" on to some of the feeds, thereby assigning his name credentials to that particular feed or line item in IRM.  At one point, after Mr. DeCamp had locked on to several upcoming feeds for his review, Mr. Bartholomew commented "Why do you have to lock your name onto all the feeds if you are not even going to be here to check them all?"

34. Mr. DeCamp could observe by the tone of Mr. Bartholomew's voice and body language that he felt very annoyed that Mr. DeCamp had locked on to many of the upcoming feeds to be checked, even though it was beyond the period of four hours' time that Mr. DeCamp was scheduled to be in Streaming with Mr. Bartholomew.  Mr. DeCamp responded that he was merely locked onto to the feeds to allow him to check the upcoming feeds for any potential technical issues, and he asked, "Was there any problem with that?"

35. Mr. Bartholomew was visibly annoyed that Mr. DeCamp had locked onto many of the upcoming feeds even though they were beyond his allotted time in Streaming. Mr. Bartholomew's response was "Well I just don't understand why you are locked on all these feeds if you're not even going to be here for them."  Mr. DeCamp again replied that he was just checking the upcoming feeds, and he again asked, "What the problem was?" Finally, Mr. Bartholomew shrugged his shoulders and still exhibited agitation in his body language when he responded, "Well no, I guess there's no problem."

36. Mr. DeCamp then continued to do his work, while Mr. Bartholomew had temporarily left and moved himself to another part of the room, leaving Mr. DeCamp alone as he

continued doing his work and continued checking all upcoming feeds accordingly without any further intervention from Mr. Bartholomew until it was time for to transition over to the front of the room for Mr. DeCamp's Live Training Session with Mr. Albini.

37. During the days and weeks following this initial June 29, 2023 incident encounter with Mr. Bartholomew, Mr. DeCamp would often be working the same shift as him but in different areas of the room.

38. As Mr. DeCamp would work, he would often hear, at various times throughout the day, a voice that was easily identifiable as Mr. Bartholomew's voice saying as loudly as he possible could in a mocking tone, "WHAT," "I CAN'T HEAR YOU," "WHAT DID YOU SAY," followed by his subtle laughter and him talking amongst a group or audience he had for his mockery.

39. Although Mr. DeCamp's name was never directly mentioned during Mr. Bartholomew's mocking episodes, it was obvious the mockery/bullying was aimed at Mr. DeCamp due to his hearing impairment.

40. On August 4, 2023, around 10:15 p.m., Mr. DeCamp's suspicions that he was the intended target of Mr. Bartholomew's mocking/bullying episodes and hostility were verified. Mr. DeCamp had been working on the streaming setup for Saturday's streaming event playouts. Mr. McCormick was the assigned supervisor on the floor. Mr. DeCamp had a question for Mr. McCormick about the assignment for the next day's scheduled UFC event payouts being built into particular IP events due to DS's requirements for capturing those particular events on pre-designated numbered IP event slots.

41. When Mr. McCormick came over to assist Mr. DeCamp with the assignment of these events, Mr. Bartholomew started yelling out as loudly as possible, "HEY CHRIS, DID YOU SAY SOMETHING TO ME? I COULDN'T HEAR YOU!" The room fell silent, but Mr. DeCamp could see that some people appeared to be laughing. Mr. McCormick continued helping Mr. DeCamp with his streaming setup question.

42. At about 10:45 p.m. that same day, Mr. Bartholomew started making his way to the exit as his shift had ended. As he walked towards the door near the streaming area where Mr. DeCamp had been seated, Mr. Bartholomew aggressively yelled, "WHAT!?" towards Mr. DeCamp's direction. Mr. Bartholomew then left the room.

43. On October 12, 2023, Mr. DeCamp sent an email to Gloria Ford ("Ms. Ford"), Director of Human Resources (HR), to express his complaint about the hostile behavior of co-worker Mr. Bartholomew that was brought to her attention in late August and was the subject of a Zoom meeting on August 29, 2023.

44. After the first meeting, Mr. DeCamp had a Zoom meeting on September 12, 2023, with Edward Demirjian ("Mr. Demirjian") from Disney's Employee Relations to discuss this complaint. There was also a follow-up Zoom meeting on October 11, 2023, with Mr. Demirjian and Dori Boone ("Ms. Boone"), Disney's Employee Relations Senior Manager.

45. Mr. DeCamp informed Ms. Ford that during the meeting on October 11, 2023, with Mr. Demirjian and Ms. Boone, it was stated that their investigation of Mr. Bartholomew's bullying of Mr. DeCamp was nearing an end, but they still had some follow-up questions/concerns to share with Mr. DeCamp. The questions/concerns centered around past incidences that had occurred between Mr. DeCamp and other

9

employees. Specifically, Mr. Demirjian mentioned four separate incidents with four different employees that did not include Mr. Batholomew.

46. The first incident involved Mr. DeCamp's interaction with Senior Employee Ryan Tolster ("Mr. Tolster") who had been assigned to train him in IRM processing. The training interaction involved asking Mr. Tolster for clarification on a procedure which Mr. DeCamp did not understand. Rather than clarify the process, Mr. Tolster questioned Mr. DeCamp's logic as to "why would you do that?"

47. Mr. DeCamp responded, "I don't know, I suppose that is why I am being trained by you so that I can understand the process you are supposed to be training me on." Mr. DeCamp felt frustrated with Mr. Tolster's resistance to training him and impatience with him asking necessary questions. Mr. DeCamp requested that his supervisor at that time end the training session with Mr. Tolster and move Mr. DeCamp to another area of the room to work the rest of his shift.

48. The second incident referenced included Mr. DeCamp and one of the Transmission Supervisors, Joe Hickey ("Mr. Hickey"). The incident involved a question that Mr. DeCamp had regarding whether a particular show was going to be played that day. Mr. Hickey had instructed him to "call the MTC to find out the information." Mr. DeCamp tried to find the information that he was looking for including what MTC was and what their contact information was, but when Mr. DeCamp's efforts proved unsuccessful, he came back to Mr. Hickey and asked him for help in obtaining the information.

49. When Mr. DeCamp asked him for a second time for help, Mr. Hickey's hostile response was, "Oh God, how long have you been here and you still don't know what MTC is or how to contact them?" Mr. DeCamp responded by telling him that is why

10

he was asking him because he is a supervisor and is supposed to be able to help employees like Mr. DeCamp with information that he did not know. Rather than have this discussion in private, Mr. Hickey chose to have this discussion with Mr. DeCamp in the middle of the work area in front of co-workers.

50. The third incident included a former Senior Employee, Dante Harris ("Mr. Harris"). On this occasion, Mr. Harris and Mr. DeCamp were working in Streaming on a very busy Saturday, where they had well over 1,000 feeds that needed to be streamed on the ESPN+, STAR+, and Verizon platforms.

51. They also took a lot of phone calls and responded to calls over the RTS System by DS Managers in charge of recording and archiving the feeds from the ESPN Campus. Mr. Harris noticed that Mr. DeCamp had not "goodnighted" some of the feeds, meaning that those feeds were over and were due to be terminated.

52. Mr. Harris at one point asked Mr. DeCamp if he needed help goodnighting the feeds. Mr. DeCamp responded, "No, thank you," and continued working. Later in the day, Mr. Harris again noticed that Mr. DeCamp had not been goodnighting feeds in a fast enough manner to his liking. Mr. Harris again asked Mr. DeCamp if he was going to goodnight the feeds. Mr. DeCamp responded that he would as soon as he could. Mr. Harris continuously pushed Mr. DeCamp as to when he was going to goodnight the feeds. Mr. DeCamp responded that he had been very busy, the same as him and everyone else in the room had been, and that he should do his job and let Mr. DeCamp do his job. Mr. DeCamp said he would goodnight the feeds as soon as he could. Mr. Harris then stated that Mr. DeCamp was not doing his job and he did not know what

11

he was doing. The banter continued back and forth until Mr. DeCamp told Mr. Harris to mind his business and let him finish his work.

53. The fourth incident was between Mr. DeCamp and another Senior Transmission Specialist, Mark Walker ("Mr. Walker"). On that evening, Mr. DeCamp had just been trained in the one of the processes of overnight procedures called "Streaming Set Up" whereby the Overnight Streaming Operator builds out and assigns the events to be played out the following day for each of the streaming platforms, including ESPN+, STAR+, and Verizon. This was during a very busy event playout day which required a lot of attention to detail and troubleshooting by all employees in each of the Streaming, IRM, and Live to Air capacities.

54. At the end of Mr. DeCamp's shift, he had managed to complete his assigned task of building out and assigning IP events for the next day's scheduled events. As Mr. DeCamp customarily did during this overnight shift, he went to inform Mr. Walker that he had completed the streaming setup task and was ready to go home.

55. Mr. Walker then questioned Mr. DeCamp as to how it was possible that he could go home with so many feeds that had been left to be goodnighted. Mr. DeCamp responded that he did not see that many feeds that needed to be goodnighted. Mr. Walker stated that it did not matter that Mr. DeCamp cleaned up other people's work, and that he needed to goodnight all his feeds. Mr. DeCamp responded that his shift was over and that he was leaving for the night.

56. After these four incidents were raised, Mr. DeCamp asked Ms. Ford where the investigation of his complaint concerning Mr. Batholomew was going, and about the

12

purpose of Employee Relations bringing up these four past incidents with other employees.

57. There appeared to be an effort by Employee Relations to try to mitigate the complaint against Mr. Bartholomew by pointing out these prior unrelated incidents to Mr. DeCamp, and drawing what appears to be a false equivalency between the incidents involving Mr. Bartholomew where Mr. DeCamp endured five to six weeks of hostile and aggressive behavior that included bullying and mocking his hearing impairment in front of other employees.

58. This was particularly concerning considering Mr. DeCamp was not receiving the training that he had been promised by Mike Gugliotti with Senior Employee's. Mr. DeCamp requested that Ms. Ford provide information on the anticipated plan for the investigation and the expected outcome.

59. Mr. DeCamp's 2023 Year End Summary stated that he progressed through his Transmission Training throughout the year. He cleared the Streaming and IRM roles and had worked to continue to hone his skills in those areas, becoming more self-reliant and capable of independently supporting those roles.

60. Due to Mr. DeCamp being scheduled to work an overnight shift, for most of 2023, this caused ongoing delays to his Live Role Training despite Mr. Gugliotti specifying in early 2023 this was a realistic goal for Mr. DeCamp to complete by April 2023.

61. As a result of Mr. DeCamp's shift change to the late overnight shift early in 2023, he learned the Streaming setup and demonstrated an ability to proficiently perform that role while working the late shift. He also trained on and was able to perform network switches for linear distribution in support of overnight master control maintenance.

62. Mr. DeCamp was eager to train in the Live Role, and although scheduling and department training priorities did not allow for him to be scheduled for much Live Role Training, he took the initiative to observe and learn the basics of that role when opportunities presented themselves.

63. Late in the summer of 2023, Mr. Braley and Mr. DeCamp began an informal training/mentorship process where they engage in impromptu training sessions. These proved extremely beneficial for Mr. DeCamp and enabled him to gain some very good insight into outlier-type operational processes that were not covered in detail during his IRM Training.

64. The plan for the upcoming year was to work with Mr. DeCamp to find live role training opportunities and to encourage him to continue working with Mr. Braley and others to initiate training outside of formal training schedules

65. On September 18, 2024, Mr. DeCamp sent an email to Mr. Gugliotti to discuss Mr. DeCamp's continued Live Linear Role Training and his desire to move toward getting cleared for that role as soon as possible, especially because they were already into the third week of football season. It had been approximately seven weeks since his last Live Linear Training Session with Todd Levine in July 2023. Mr. Gugliotti stated he was going to reach out to the Training Committee to put Mr. DeCamp's Live Linear Training sessions back on their radar and coordinate a plan with them to provide Mr. DeCamp any additional training he needed scheduled, and to get him back on the path towards being evaluated and cleared for this role.

66. In September 2024, Mr. Gugliotti emailed Mr. DeCamp to inform him that he added Live Linear Training to his schedule for the following day and week. Mr. Gugliotti

stated he would look for opportunities to get training on Mr. DeCamp's schedule while the Training Committee continued to work to update/improve the evaluation process.

67. On or about October 12, 2024, during Mr. DeCamp's 2024 Year End Conversation with Mr. Gugliotti, Mr. DeCamp expressed his concerns regarding the unpleasant, unprofessional, and unproductive Training Session he experienced with Mr. Albini a couple of weeks prior. Mr. DeCamp emphasized the need for him to have better prepared and more engaged Senior Operators who are ready and willing to train for future Training Sessions to be more productive for Mr. DeCamp. Mr. Gugliotti agreed that this would be his intention when assigning Mr. DeCamp to Live Training going forward.

68. Mr. DeCamp also emphasized to Mr. Gugliotti that although he felt he had the basic understanding of how each of the disciplines of the Live Linear Role work, including Live Linear Check Ins, REMI/REMCO Check Ins, Encoder MUX Feed Building, and Satellite Uplinks/Antenna Moves, he would definitely need more consistent training on a weekly basis in each of those areas in order for him to gain full proficiency in each area. This would help ensure that Mr. DeCamp successfully clears the Live Linear Role.

69. Mr. DeCamp also pointed out and requested that Mr. Gugliotti take into consideration which of the future shifts in the 2025 Shift Rotation he thought would offer Mr. DeCamp the highest probability of successfully completing his Live Linear Training. Mr. Gugliotti agreed to "bear this in mind" when considering which shifts to assign Mr. DeCamp in the 2025 Shift Rotations.

15

70. Lastly, Mr. DeCamp and Mr. Gugliotti discussed plans to accommodate Mr. DeCamp's rotator cuff surgery, which he had originally scheduled for mid-August, but then postponed indefinitely pending him getting a second opinion. Mr. DeCamp informed Mr. Gugliotti that he will be getting that second opinion later that month, and that based on the second opinion, he would decide if and when to schedule the surgery.

71. On November 20, 2024, Mr. DeCamp met with Mr. Gugliotti and Mr. Simeonidis to discuss the process of his training in the Live Linear Role. As of that time, Mr. DeCamp had trained 173.5 hours in the Live Linear Check-In Role during the entirety of 2024. The training was broken down into multiple categories: Live Linear Check Ins, REMI, REMCO Check Ins, MUX Building and Encoder Set Up, and Antenna Moves and Uplinks. According to the Transmission Training Smartsheet, during 2024, Mr. DeCamp's training time had been comprised of the following areas:

    i.   REMI Check Ins: 45 Hours

    ii.   REMCO Check Ins: 9.5 Hours

    iii.   Live Linear Check Ins: 36 Hours

    iv.   MUX Building and Encoder Set Up: 34 Hours

    v.   Antenna Moves and UPLINK Set Ups: 14.5 Hours

    vi.   Additional Miscellaneous Training: 34.5 Hours

72. On November 20, 2024, Mr. DeCamp was informed that Mr. Gugliotti would no longer be his Supervisor, and Mr. DeCamp would now be reporting to Aaron Sneegas ("Mr. Sneegas"), Transmission Supervisor, beginning January 15, 2025. During this meeting, Mr. Simeonidis stated that he feels it is time for the company start to see a

THE MCMINN EMPLOYMENT LAW FIRM, LLC

"return on their investment" in Mr. DeCamp's training, and he compared Mr. DeCamp's training progress to that of a much younger intern, Dawson Leary. Mr. Simeonidis stated that he felt Mr. DeCamp should have cleared the training role after having "trained more than 200 hours in that role," which was untrue. Mr. Simeonidis also questioned why it took Mr. DeCamp so long to clear the Live Linear Check-In role.

73. In a November 22, 2024 follow-up email to Mr. Gugliotti and Mr. Simeonidis after the November 20, 2024 meeting, Mr. DeCamp proposed a plan wherein once those individuals training him have expressed that he is able to demonstrate a level of proficiency in a particular role (e.g. REMI Check Ins), that he should be considered "provisionally C\cleared" in that role and routinely assigned to do that function as required with minimal supervision.

74. Meanwhile, he would need to continue to increase his training and comfort level in each of the other areas of the Live Linear Check In Training (e.g. Live Linear Event Check In's, MUX Building, Encoder Set Up and Antenna Moves/Satellite Uplinks). Once the mutually agreed upon additional training timeline would be provided for Mr. DeCamp to become proficient in each of those other areas, he should be "provisionally cleared" and routinely scheduled in each cleared area until he has "satisfactorily cleared" each of the four areas of Live Linear Check Ins. Once he has "satisfactorily cleared" all four areas of the Live Linear Check In Training, he should be considered cleared in all four areas of Live Linear Check Ins, and "completely cleared" in the Live Linear Check In role. If Mr. Gugliotti agreed to this proposed plan, he and Mr. DeCamp could set up a timeline to implement it.

17

75. On November 25, 2024, Mr. Simeonidis emailed Mr. DeCamp and stated that Mr. DeCamp needed to improve his pace and critical thinking. Critical thinking was needed to mitigate issues as fast as possible. They would meet again and review the plan to get more training and work towards getting Mr. DeCamp scheduled for a clear test.

76. On January 15, 2025, Mr. DeCamp returned to work after being out on leave for vacation and due to rotator cuff surgery. He continued his intensive Live Role Training.

### C. Mr. DeCamp files a complaint with Human Resources about retaliation and a hostile work environment.

77. On February 9, 2025, Mr. DeCamp sent Mr. Thibeau a message via LinkedIn expressing concern over his job security. Specifically, Mr. DeCamp's concerns centered around his progression in his Live Role Training since he had been back from rotator cuff surgery. Mr. DeCamp believed the training had been going very well and was very productive. However, the training comments he had received had him fear he may be subjected to termination.

78. On February 11, 2025, Mr. DeCamp sent an email to Anna Champagne ("Ms. Champagne"), Associate HR Business Partner, about an "Urgent HR Matter" that could affect his employment. He stated he had been employed by Disney as a Transmission Specialist II for three years and eight months as of that time. Mr. DeCamp stated during his employment he has struggled with the lack of quality and consistency of training in the Transmission Department. Most recently, he had been training the Live Linear Check In role, wherein he received sporadic training over the

last year-and-a-half with the goal of finally clearing that role with management very soon.

79. Mr. DeCamp stated he had informed Mr. Simeonidis that his assessment of his training progress was not accurate, wherein he stated Mr. DeCamp had spent over 200 hours training in the Live Role but still had not been able to clear that role. Mr. DeCamp felt that the training he had received was inadequate and inconsistent, which he expressed to Mr. Gugliotti. Mr. Simeonidis further informed Mr. DeCamp he was hired as a Level 2 Employee but had not been performing at that level or quality as expected, and they wanted to start seeing a "return on their investment" regarding his training.

80. When Mr. DeCamp asked Mr. Simeonidis if they were considering terminating his employment, Mr. Simeonidis laughed and stated "No, that was not their immediate plan but that they felt it was time to put forth a plan for [him] to clear the live role by a specified date or be placed on a Performance Improvement Plan."

81. Mr. DeCamp also informed Ms. Champagne that during one of his training sessions with Todd Levine ("Mr. Levine"), Senior Transmission Operator, it was interrupted briefly by Mr. Sneegas, who told Mr. Levine that Mr. Simeonidis was requesting to meet with Mr. Levine right away. When Mr. Levine returned, Mr. DeCamp asked Mr. Levine if everything was okay. Mr. Levine responded that everything was fine. When Mr. DeCamp pressed Mr. Levine to see if Mr. Simeonidis was questioning him about their training session, Mr. Levine responded "No, it had nothing to do with the training and everything was okay." They continued the training session with compliments from Mr. Levine that he felt Mr. DeCamp was performing "very well,"

that he practically did the REMI Check-Ins alone, and that he just needed to be given the opportunity by management to do more of the REMI check-ins alone.

82. Since this training, Mr. DeCamp has felt that Mr. Simeonidis has been targeting him as he has had negative interactions with supervisors. One in particular was where Aaron Bates ("Mr. Bates"), Transmission Supervisor, had written up Mr. DeCamp on two different occasions, questioning his ticket write-up submission to engineering for a piece of equipment that failed to perform as expected.

83. Mr. Bates was questioning Mr. DeCamp's troubleshooting techniques before submitting the engineering ticket. Mr. Bates also unreasonably admonished Mr. DeCamp for not adequately checking the status of a school basketball game where the school had failed to call the Transmission Department to perform a transmission check on their feed and not following through with the remote traffic sufficiently.

84. The recent events caused Mr. DeCamp to be concerned that he had become a target of Mr. Simeonidis, causing Mr. DeCamp to feel very distressed and subjected to a hostile work environment. Mr. DeCamp felt as though his daily actions were unreasonably monitored under a microscope in order to justify a negative review of his training progress and overall work performance that could result in his termination.

85. On February 13, 2025, Ms. Champagne responded to Mr. DeCamp's complaint via email stating she received his email, and the matter would be referred to Employee Relations.

86. On February 13, 2025, Heather Martone-Santos ("Ms. Martone-Santos"), Employee Relations Manager, sent an email to Mr. DeCamp about his recently filed complaint stating she wanted to discuss his complaint. Mr. DeCamp responded with his

20

availability for a meeting.  A meeting was scheduled for February 14, 2025, at 2:00 pm.

87. On February 17, 2025, Mr. DeCamp sent an email to Ms. Martone-Santos with important documents relating to his problems concerning Live Linear Training.  This included documentation demonstrating that Mr. DeCamp outlined the training problems for Mr. Gugliotti, including that he did not feel Mr. Albini was providing the information needed during training.

88. Documentation also showed that Mr. DeCamp reminded Mr. Gugliotti of his promises of additional live training and that weeks had passed since this was promised.  Mr. DeCamp also informed her about Mr. Simeonidis' comment that it was time for the company to start seeing a return on their investment in Mr. DeCamp's training.  Additionally, Mr. DeCamp expressed that he felt as though Mr. Bates was targeting him with unreasonable write-ups.

89. On February 27, 2025, Mr. DeCamp sent an email to Ms. Martone-Santos following up and asking if there was any updated information after the meeting.  Ms. Martone-Santos responded that she had an update and scheduled a meeting that day to discuss.

### D. **Mr. DeCamp is subjected to retaliation when his employment is suddenly terminated.**

90. On March 13, 2025, Mr. DeCamp met with Mr. Demirjian and Molly Harbeck to discuss Mr. DeCamp allegedly violating Disney's Confidential Information and Computer Usage and Security policies wherein he was accused of forwarding work emails to his personal email address.  Mr. DeCamp was directed to delete any work emails that he had forwarded to his personal email address.  After the meeting, Mr. Demirjian sent an email to Mr. DeCamp confirming he understood these Disney

21

policies and would comply. The email stated nothing about Mr. DeCamp's employment being subject to termination as a result of these allegations.

91. On March 13, 2025, Mr. DeCamp replied to Mr. Demirjian's email confirming he reviewed Disney's Confidential Information and Computer Usage and Security policies and understood that when conducting company business, the use of his personal email is strictly prohibited. He also understood that confidential company business may not be used or shared for his own personal benefit or disclosed to others inside or outside the company. Mr. DeCamp stated that he previously refrained from violating such company policies, he would refrain from doing this in the future.

92. On March 21, 2025, despite Mr. DeCamp denying allegations about violating Disney's policies concerning emails, and this being the first time he was accused of violating any company policy, his employment was suddenly terminated by Disney.

93. Notably, the 2024 Disney Employee Manual contains an e-mail policy that provides:

> Company/Production computer systems are provided for business purposes. The Company understands that cast and crew will use these systems from time to time for personal activities. Cast and crew should have no expectation of privacy when doing so. Such personal use should be reasonable and must not interfere with work performance or create cost or liability to the Company or Production. Cast and crew may not use these systems to solicit for commercial ventures, or otherwise for their individual/personal benefit.

Therefore, the company policy does not prohibit using company email for personal use altogether, but instead limits the reasons for using company email. The policy also does not prohibit forwarding company emails to personal email accounts, for which Mr. DeCamp was accused. Mr. DeCamp never used his company email in violation of company policy.

22

94. Furthermore, the 2024 Disney Employee Manual contains disciplinary policy that provides that "[i]mproper conduct may be addressed by such steps as verbal counseling, verbal or written warnings, suspension and/or termination, as deemed appropriate by the Company in the particular circumstance." Mr. DeCamp did not go through the disciplinary steps prior to his termination. Instead, Disney immediately terminated Mr. DeCamp when he was unreasonably accused of violating the company's e-mail policy without any prior warning.

95. Disney also has an anti-retaliation policy that provides:

> Coming forward with questions or concerns may sometimes feel like a difficult decision, but the Company is committed to fostering an environment that encourages and protects people who Speak Up when they observe conduct that may violate our policies, the Standards of Business Conduct or applicable laws and regulations, or who participate in or cooperate with an investigation of such concerns. Accordingly, **the Company strictly prohibits any form of retaliatory action against any person who in good faith uses the Company's Speak Up policy, reports misconduct**, participates in an investigation, participates in any proceeding or hearing conducted by a governmental enforcement agency, or opposes actual or perceived violations of the Company's policies or applicable laws or regulations. "In good faith" means the cast or crew member has made a genuine attempt to provide honest and accurate information, even if they are later proven to have been mistaken . . .
>
> Retaliation is prohibited by law in many contexts, but the Company's policy encompasses a broader range of conduct than what the law prohibits. Examples of retaliatory action that Company prohibits include: Demotion, suspension, or **termination of employment** . . .

Despite Disney's clear anti-retaliation policy, Mr. DeCamp faced retaliation when his employment was terminated on March 21, 2025 after he filed a complaint with HR,

23

per the company's "Speak Up" policy, about a hostile work environment and retaliation.

96. Disney alleging that Mr. DeCamp's termination was due to him violating Disney's policies concerning email is a pretext for unlawful retaliation.

97. Disney terminated Mr. DeCamp's employment in retaliation after he filed a complaint with HR about a hostile work environment and retaliation.

## COUNT I

### DISABILITY DISCRIMINATION, HOSTILE WORKING ENVIRONMENT, IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42  U.S.C. § 12101 et seq.

98. The Plaintiff hereby re-alleges and reincorporates paragraphs 1-97 with the same force and impact as if fully set forth herein.

99. Plaintiff was diagnosed with slight-to-moderate hearing loss and Eustachian Tube Dysfunction.

100.    Plaintiff's medical conditions substantially limited one or more of his major life activities, including but not limited to hearing and working.

101.    Plaintiff has a record of his medical condition.

102.    Plaintiff is disabled.

103.    Plaintiff notified Defendant of his medical conditions, and Defendant perceived Plaintiff to be disabled.

104.    Plaintiff was at all times qualified for the position he held.

105.    Defendant subjected Plaintiff to a hostile work environment, wherein a coworker, Mr. Bartholomew, repeatedly bullied and mocked Plaintiff's hearing impairment over a period of five to six weeks.

106.    Defendant knew of discriminatory statements and actions made by its employees and management, as Plaintiff reported the hostile behavior to his superiors and Human Resources.

107.    Defendant took no meaningful corrective action to address the discrimination and hostile work environment.

108.    Defendant permitted a discriminatory and hostile work environment toward Plaintiff to persist.

109.    Plaintiff suffered adverse employment actions, including, but not limited to, being subjected to a hostile work environment and the termination of his employment on March 21, 2025.

110.    Defendant's conduct violated 42 U.S.C. § 12101 et seq. by discriminating against Plaintiff, harassing Plaintiff, creating a hostile work environment, retaliating against Plaintiff, and terminating Plaintiff's employment on the basis of his disability and/or perceived disability.

111.    As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

112.    Plaintiff is seeking damages as a result of Defendant's unlawful conduct.

## COUNT II

### AGE DISCRIMINATION, HOSTILE WORKING ENVIRONMENT, IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967

113. The Plaintiff hereby re-alleges and reincorporates paragraphs 1-112 with the same force and impact as if fully set forth herein.

114. At all relevant times, Plaintiff was 64 years old and a member of a protected class under the Age Discrimination in Employment Act of 1967 ("ADEA").

115. Plaintiff was at all times qualified for the position he held, as demonstrated by his positive performance reviews and continued progression through training.

116. Defendant subjected Plaintiff to adverse employment actions, including termination, due to his age. Defendant's age-based animus was demonstrated when a supervisor, Mr. Simeonidis, compared Plaintiff's training progress to that of a "much younger intern" and stated it was time for the company to see a "return on their investment" in Plaintiff.

117. Defendant's stated reason for terminating Plaintiff's employment—an alleged violation of the company's email policy—is a pretext for unlawful age discrimination.

118. Plaintiff's age was a motivating factor in Defendant's decision to subject him to discriminatory treatment and terminate his employment.

119. Defendant's conduct violated the Age Discrimination in Employment Act of 1967 by discriminating against Plaintiff, retaliating against him, and terminating his employment due to his age.

120. As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance,

26

emotional and psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

121.    Plaintiff is seeking damages as a result of Defendant's unlawful conduct.

## COUNT III

### RETALIATION,
### IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT,
### 42 U.S.C. § 12101 et seq.

122.    The Plaintiff hereby re-alleges and reincorporates paragraphs 1–121 with the same force and impact as if fully set forth herein.

123.    Plaintiff engaged in protected activities under the ADA/ADAAA by opposing discriminatory practices and making complaints to his supervisors and to Human Resources about conduct he reasonably believed constituted unlawful harassment, discrimination, and a hostile work environment based on his disability and/or perceived disability.

124.    Plaintiff's protected activities include, but are not limited to, his complaint on August 7, 2023, about Mr. Bartholomew's bullying and mocking of his hearing impairment; his subsequent complaints and participation in an investigation with Employee Relations in September and October 2023; and his formal complaint to Human Resources on February 11, 2025, regarding a hostile work environment, retaliation, and disparate treatment.

125.    After Plaintiff engaged in these protected activities, Defendant retaliated against him by, among other things, subjecting him to increased scrutiny and unreasonable write-ups, accusing him of violating company policy, and ultimately terminating his employment on March 21, 2025.

27

126.    The temporal proximity between Plaintiff's protected activities, particularly his February 2025 complaint to HR, and his termination in March 2025, establishes a causal connection between the protected activity and the adverse employment action. Defendant's stated reason for the termination was pretext for retaliation.

127.    Defendant's conduct violated the anti-retaliation provisions of the ADA/ADAAA, including 42 U.S.C. § 12203, by terminating Plaintiff's employment because he opposed unlawful disability discrimination and a hostile work environment.

128.    As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

129.    Plaintiff is seeking damages as a result of Defendant's unlawful conduct.


## COUNT IV

### RETALIATION,
### IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT,
### 29 U.S.C. § 621 et seq.

130.    The Plaintiff hereby re-alleges and reincorporates paragraphs 1–129 with the same force and impact as if fully set forth herein.

131.    At all relevant times, Plaintiff was 64 years old and a member of a protected class under the Age Discrimination in Employment Act.

132.    Plaintiff engaged in protected activities under the ADEA by opposing age-based discriminatory practices and making complaints to his supervisors and to Human Resources about conduct he reasonably believed constituted unlawful age

28

discrimination and a hostile work environment based on his age, including being compared unfavorably to a much younger intern and being subjected to disparate treatment in training and evaluation.

133. After Plaintiff engaged in these protected activities, Defendant retaliated against him by, among other things, subjecting him to increased scrutiny and unreasonable write-ups, questioning his performance and pace in a manner tied to his age, accusing him of violating company policy, and ultimately terminating his employment on March 21, 2025.

134. The temporal proximity between Plaintiff's protected activities and his termination, together with Defendant's age-based comments and shifting explanations, establishes a causal connection between the protected activity and the adverse employment action. Defendant's stated reason for the termination was pretext for retaliation.

135. Defendant's conduct violated the anti-retaliation provisions of the ADEA, including 29 U.S.C. § 623(d), by terminating Plaintiff's employment because he opposed unlawful age discrimination.

136. As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

137. Plaintiff is seeking damages as a result of Defendant's unlawful conduct.

## COUNT V

### DISCRIMINATION AND HOSTILE WORK ENVIRONMENT, IN VIOLATION OF CONN. GEN. STAT. § 46a-60(b)(1)

138.    The Plaintiff hereby re-alleges and reincorporates paragraphs 1–137 with the same force and impact as if fully set forth herein.

139.    Defendant's actions constitute discrimination and the creation of a hostile work environment on the basis of Plaintiff's disability and age, in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(b)(1).

140.    Defendant, through its employees and managers, subjected Plaintiff to harassment and a hostile work environment due to his hearing impairment and his age, including mocking his disability and making disparaging comments comparing his performance and training progress to that of a much younger intern.

141.    Defendant further discriminated against Plaintiff by terminating his employment on the basis of his disability, perceived disability, and age.

142.    Defendant's actions and conduct, including permitting ongoing harassment, failing to take effective remedial action, and terminating Plaintiff's employment, constitute disability- and age-based discrimination and hostile work environment in violation of Conn. Gen. Stat. § 46a-60(b)(1).

143.    As a result of the foregoing conduct in violation of Connecticut law, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

144.    Plaintiff is seeking damages as a result of Defendant's unlawful conduct.

30

THE MCMINN EMPLOYMENT LAW FIRM, LLC

## COUNT VI

### RETALIATION,
### IN VIOLATION OF CONN. GEN. STAT. § 46a-60(b)(4)

145.    The Plaintiff hereby re-alleges and reincorporates paragraphs 1–144 with the same force and impact as if fully set forth herein.

146.    Plaintiff engaged in protected activities under CFEPA by opposing discriminatory employment practices and filing complaints with management, Employee Relations, and Human Resources regarding disability, perceived disability, and age discrimination, a hostile work environment, retaliation, and disparate treatment.

147.    After Plaintiff engaged in these protected activities, Defendant retaliated against him by, among other things, subjecting him to increased scrutiny and unreasonable write-ups, questioning his performance and training in a manner tied to his protected status and complaints, accusing him of violating company policy, and ultimately terminating his employment on March 21, 2025.

148.    Defendant's actions were motivated, at least in part, by Plaintiff's opposition to discriminatory practices and his internal complaints of discrimination and retaliation.

149.    Defendant's actions constitute unlawful retaliation in violation of CFEPA, Conn. Gen. Stat. § 46a-60(b)(4).

150.    As a result of the foregoing conduct in violation of Connecticut law, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

151.    Plaintiff is seeking damages as a result of Defendant's unlawful conduct.

31

**PRAYER FOR RELIEF**

Wherefore the Plaintiff prays that this court award:

1.  Money damages;

2.  Costs;

3.  Punitive damages, attorney fees, and expert witness fees;

4.  Pre-judgment interest

5.  Trial by jury; and

6.  Such other relief as the Court deems just, fair, and equitable.

THE PLAINTIFF,
CHRISTOPHER C. DECAMP


By: _____/s/_____
      Michael C. McMinn (#*ct27169*)
      Angela Rodroguez (#ct31850)
      **THE MCMINN EMPLOYMENT**
      **LAW FIRM, LLC**
      1000 Lafayette Blvd., Suite 1100
      Bridgeport, CT 06604
      Tel: (203) 683-6007
      Fax: (203) 680-9881
      michael@mcminnemploymentlaw.com
      angela@mcminnemploymentlaw.com
